NOT YET SCHEDULED FOR ORAL ARGUMENT

Nos. 26-5299, 26-5334

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

KATIE PHANG,

*Plaintiff-Appellee*

v.

TODD BLANCHE, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES,

*Defendant-Appellant*

On Appeal from the
United States District Court for the District of Columbia
Case No. 1:26-cv-1417
Hon. Emmet G. Sullivan, Presiding

# PLAINTIFF-APPELLEE'S COMBINED MOTION TO DISMISS APPEAL NO. 26-5334 AND RESPONSE IN OPPOSITION TO DEFENDANT-APPELLANT'S MOTION FOR STAY PENDING APPEAL

Brendan Ballou
Emily Gilman
Samuel T. Ward-Packard
**PUBLIC INTEGRITY PROJECT**
Telephone: (917) 684-3900
ballou@publicintegrityproject.org
emily@publicintegrityproject.org
sam@publicintegrityproject.org

*Counsel for Plaintiff-Appellee Katie Phang*

# TABLE OF CONTENTS


INTRODUCTION ........ 1

STATEMENT ........ 2

I. Factual Background ........ 2

A. The Epstein Files Transparency Act required the Attorney General to disclose records relating to Jeffrey Epstein and his crimes by December 2025. ........ 2

B. The Attorney General granted himself a textually baseless exemption from reviewing and producing foreign-language documents. ........ 3

II. Procedural History ........ 4

A. Journalist Katie Phang sued, then moved for a narrow preliminary injunction to redress Epstein Act violations frustrating her reporting. ........ 4

B. The Attorney General elected not to defend his substantive compliance with the Act. ........ 7

C. The District Court granted Phang a preliminary injunction that required the Attorney General to begin reviewing and producing foreign-language documents. ........ 7

D. Without seeking a stay, the Attorney General defied the District Court's order for nearly three months. ........ 10

E. The District Court entered an enforcement order giving the Attorney General one week to initiate review of foreign-language documents. ........ 11

F. The District Court declined to grant a stay of the enforcement order pending appeal. ........ 12

ARGUMENT ........ 13

I. The Court should dismiss appeal No. 26-5334 for want of jurisdiction ..... 13

A. The enforcement order is not an appealable order. ..... 13

B. The appeal of the enforcement order is an improper attempt to expand the record on appeal of the preliminary injunction order. ..... 15

II. The Court should deny the motion for a stay pending appeal. ..... 16

A. The Attorney General is not likely to prevail on the merits of his appeal of the preliminary injunction order. ..... 17

1. Phang has standing. ..... 17

2. Phang has a right of action under the Administrative Procedure Act. ..... 23

3. The Attorney General conceded his substantive violation of the Epstein Act with respect to foreign-language documents ..... 30

4. The District Court applied the correct APA standard. ..... 31

5. The District Court did not improperly grant "full relief." ..... 33

B. Grant of a stay will cause irreparable harm to Phang ..... 35

C. Denial of a stay will not harm the Attorney General. ..... 36

D. The balance of equities and public interest weigh against a stay. ..... 39

CONCLUSION ..... 40

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*AIDS Vaccine Advoc. Coal. v. Dep't of State*,
No. 25-5046,
2025 WL 621396 (D.C. Cir. Feb. 26, 2025) ........ 15

*In re Aiken County*,
725 F.3d 255 (D.C. Cir. 2013) ........ 33

*Andrus v. Glover Constr. Co.*,
446 U.S. 608 (1980) ........ 33

*Beame v. Friends of the Earth*,
434 U.S. 1310 (1977) (Marshall, J., in chambers) ........ 38

*Beatty v. Trump*,
No. 26-5224,
2026 WL 1970557 (D.C. Cir. July 8, 2026) ........ 38

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984) ........ 26

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ........ 26

*Bowen v. Mich. Acad. of Family Physicians*,
476 U.S. 667 (1986) ........ 25

*Chaverra v. ICE*,
Civ. A. No. 18-289,
2018 WL 4762259 (D.D.C. Oct. 2, 2018) ........ 28, 29

*CREW v. DOJ*,
846 F.3d 1235 (D.C. Cir. 2017) ........ 26, 28, 29

*CREW v. OMB*,
791 F. Supp. 3d 29 (D.D.C. 2025) ........ 18

*Ctr. for Nat'l Sec. Studies v. DOJ*,
217 F. Supp. 2d 58 (D.D.C. 2002) .......... 37

*Ctr. for Pub. Integrity v. DOD*,
411 F. Supp. 3d 5 (D.D.C. 2019) .......... 34

*Diamond v. Charles*,
476 U.S. 54 (1986) .......... 18, 19

*District of Columbia v. Air Florida, Inc.*,
750 F.2d 1077 (D.C. Cir. 1984) .......... 24

*Edmonds v. FBI*,
417 F.3d 1319 (D.C. Cir. 2005) .......... 35

*Ellipso, Inc. v. Mann*,
480 F.3d 1153 (D.C. Cir. 2007) .......... 24

*EPIC v. Presidential Advisory Comm'n on Election Integrity*,
266 F. Supp. 3d 297 (D.D.C. 2017) .......... 21

**FEC v. Akins*,
524 U.S. 11 (1998) .......... 19, 22

*Friends of Animals v. Jewell*,
828 F.3d 989 (D.C. Cir. 2016) .......... 19

**Fund for Animals, Inc. v. BLM*,
460 F.3d 13 (D.C. Cir. 2006) .......... 23, 25

*Leal Garcia v. Texas*,
564 U.S. 940 (2011) .......... 29

*GTE Sylvania, Inc. v. Consumers Union*,
445 U.S. 375 (1980) .......... 15

*Haitian Bridge All. v. Biden*,
No. 21-cv-3317, 2026 WL 627405 (D.D.C. Mar. 6, 2026) .......... 31

*Humane Soc'y of the U.S. v. Vilsack*,
797 F.3d 4 (D.C. Cir. 2015) .......... 17

*KalshiEX LLC v. CFTC*,
119 F.4th 58 (D.C. Cir. 2024) .......... 16

*Karst Envtl. Educ. & Prot., Inc. v. EPA*,
475 F.3d 1291 (D.C. Cir. 2007) .......... 25

*Kingdom v. Trump*,
No. 26-5181,
2026 WL 1905418 (D.C. Cir. June 17, 2026) .......... 39

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994) .......... 13

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......... 39

**League of Women Voters v. DHS*,
No. 26-5243,
2026 WL 2643439 (D.C. Cir. Sept. 4, 2026) .......... 31, 34

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) .......... 22

*Mach Mining, LLC v. EEOC*,
575 U.S. 480 (2015) .......... 24

*McComb v. Jacksonville Paper Co.*,
336 U.S. 187 (1949) .......... 15

*Medina v. Planned Parenthood S. Atl.*,
606 U.S. 357 (2025) .......... 22

*N.H. Youth Movement v. Scanlan*,
No. 26-1740,
2026 WL 2620381 (1st Cir. Sept. 4, 2026) .......... 39

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 16

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) .......... 33

*Payne Enters., Inc. v. United States*,
837 F.2d 486 (D.C. Cir. 1988) ........ 35

*Prisology, Inc. v. BOP*,
852 F.3d 1114 (D.C. Cir. 2017) ........ 22

*Pub. Citizen v. Carlin*,
2 F. Supp. 2d 1 (D.D.C. 1997) ........ 21

*Pub. Citizen v. DOJ*,
491 U.S. 440 (1989) ........ 20

*Pub. Citizen v. NHTSA*,
489 F.3d 1279 (D.C. Cir. 2007) ........ 21

*Pub. Citizen v. U.S. Trade Representative*,
5 F.3d 549 (D.C. Cir. 1993) ........ 25

*Ramirez v. ICE*,
568 F. Supp. 3d 10 (D.D.C. 2021) ........ 32

*Ray v. BOP*,
811 F. Supp. 2d 245 (D.D.C. 2011) ........ 29

**Seife v. HHS*,
440 F. Supp. 3d 254 (S.D.N.Y. 2020) ........ 21

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
985 F.3d 1032 (D.C. Cir. 2021) ........ 31

**Texas v. United States*,
798 F.3d 1108 (D.C. Cir. 2015) ........ 8

*United States v. Erika, Inc.*,
456 U.S. 201 (1982) ........ 25

*United States v. Fausto*,
484 U.S. 439 (1988) ........ 25

*United States v. Richardson*,
418 U.S. 166 (1974) ........ 21, 22

*Wash. Metro. Area Transit Comm'n v. Reliable Limousine Serv., LLC*,
776 F.3d 1 (D.C. Cir. 2015) .......... 13

*Washington Post v. DHS*,
459 F. Supp. 2d 61 (D.D.C. 2006) .......... 34

**Statutes**

5 U.S.C. § 701(a)(1) .......... 23, 24

5 U.S.C. § 702 .......... 23, 24, 26, 28

5 U.S.C. § 703 .......... 32

5 U.S.C. § 704 .......... 24, 26, 28

5 U.S.C. § 706 .......... 8, 31, 32, 33

28 U.S.C. § 1292(a)(1) .......... 13

Epstein Files Transparency Act,
Pub. L. No. 119–38, 139 Stat. 656 (2025) .......... *passim*

**Rules**

D.D.C. LCvR 7(m) .......... 12

Fed. R. App. P. 8(a)(2)(A) .......... 16

Fed. R. App. P. 8(a)(2)(B)(ii) .......... 38

**Other Authorities**

H.R. 9694, 119th Cong. (2026) .......... 29, 30

## INTRODUCTION

The Epstein Files Transparency Act set a deadline of December 2025 for the Department of Justice to disclose records in its custody relating to Jeffrey Epstein. The Act's disclosure mandate is simple but sweeping: Records must be disclosed unless subject to withholding on narrow, enumerated grounds. The Act does not authorize categorical withholding of foreign-language records, nor does it authorize DOJ to refuse to review categories of records for reasons of practicality. Yet the Attorney General determined that DOJ would not review or disclose any foreign-language records, asserting that such review was "not practicable."

Journalist Katie Phang is reporting on Epstein, his crimes, and DOJ's decades-long failure to bring him to justice. Phang sued to redress DOJ's deficient compliance with the Act, including its failure to review foreign-language records. After Phang demonstrated that denial of access to those records was hindering her reporting on Epstein's transnational sex-trafficking network, the District Court entered a preliminary injunction ordering the Attorney General to initiate review and disclosure of those records by July 2.

The Attorney General now seeks a stay pending appeal of that order. But he fails to satisfy any of the criteria for a stay. He has conceded the statutory merits. He has not substantiated his claim of irreparable harm with record evidence. And his conduct has been inequitable: He granted himself a stay by refusing to obey the District Court's unambiguous order for nearly three months. The Court should not reward such a meager showing with the extraordinary relief of a stay.

## STATEMENT

### I. Factual Background

#### A. The Epstein Files Transparency Act required the Attorney General to disclose records relating to Jeffrey Epstein and his crimes by December 2025.

Late last year, Congress passed and the President signed into law the Epstein Files Transparency Act, Pub. L. No. 119–38, 139 Stat. 656–58 (2025) ("Act" or "Epstein Act"). The Act aimed to shed comprehensive light on the Department of Justice's decades-long failure to achieve justice for the victims of Jeffrey Epstein's crimes. To that end, the Act imposed the most sweeping records-disclosure mandate in American history on DOJ and the Attorney General, and set a firm December 2025 deadline for full compliance.

The Act required the Attorney General to identify and publicly disclose "all" records in the Department's, the FBI's, or any U.S. Attorney's possession that "relate to" one or more of nine subjects, including Epstein, his co-conspirators, and the government's investigations into his crimes. Act § 2(a)(1)–(9). The Act authorized the Attorney General to "withhold or redact" such records only on five narrow and enumerated grounds. *Id.* § 2(c)(1)(A)–(E). Crucially for present purposes, the Act did not authorize withholding or redaction of foreign-language materials, nor did it authorize any practicality-based limits on review or disclosure. *See id.* § 2.

### B. The Attorney General granted himself a textually baseless exemption from reviewing and producing foreign-language documents.

Plaintiff-Appellee Katie Phang alleges that the Attorney General failed to comply with the Epstein Act in many ways. For instance, he improperly redacted or withheld many documents, released other documents without redacting victim information, published uncensored

images depicting nude victims, and failed to publish the required redaction log in the Federal Register. R.1:5–9.[1]

Although Phang aims to redress all these deficiencies, only one shortcoming is immediately at issue. On January 30, 2026, the Attorney General issued a letter asserting that DOJ had satisfied "its production obligations under the Act." R.9-3:128. That letter disclosed the Attorney General's decision not to review or produce *any* "foreign-language document[s]" covered by the Act, on the supposed basis that first-level responsiveness review was "not practicable." R.9-3:132.

## II. Procedural History

### A. Journalist Katie Phang sued, then moved for a narrow preliminary injunction to redress Epstein Act violations frustrating her reporting.

Phang is an attorney and independent journalist based in Miami, Florida. R.9-2:1. She previously hosted a show—*The Katie Phang Show*—on MSNBC, and now reports on legal news on several platforms. R.9-2:2. As of this filing, Phang's YouTube channel has over 800,000 subscribers, and her news and analysis videos on that platform routinely reach

[1] "R.#:#" indicates a district court record document; the number before the colon is the docket entry and the number or range following the colon refers to the ECF-generated pagination.

hundreds of thousands of viewers. Katie Phang, YouTube, www.youtube.com/@katiephangnews (last visited Sept. 25, 2026).

Phang has conducted and published in-depth reporting on Jeffrey Epstein and his crimes for years. R.9-2:2. The record reflects that at the time of the PI briefing Phang had published 72 episodes about Epstein and related topics during the prior year; had interviewed at least two survivors of Epstein's crimes; had published Epstein episodes that had been viewed at least 9.7 million times; and had earned tens of thousands of dollars in resulting revenue. *Id.*

Phang brought this lawsuit because the Attorney General's violations of the Epstein Act hinder her work as an investigative reporter. R.1:2; R.9-2:3. For instance, the Attorney General's withholding of covered documents that are known from other sources to exist has prevented Phang from reporting on the contents of those documents. R.9-2:4–5. As relevant here, the Attorney General's decision to withhold *all* foreign-language documents has impaired Phang's ongoing reporting about the Epstein story's transnational scope. R.9-2:5. Epstein's sex-trafficking network is subject to criminal investigation in several foreign jurisdictions, Epstein himself often traveled abroad for extended periods,

and Epstein had close relationships with many high-profile foreigners, including apex political leaders. R.9-2:5; R.9-1:29.

Phang seeks a comprehensive remedy for the Attorney General's many violations of the Epstein Act. R.1:14–15. Recognizing, however, that litigation could take years, Phang moved in May for a narrow preliminary injunction to redress the handful of open-and-shut violations that were most acutely impairing her time-sensitive reporting. R.9; R.9-1. Specifically, Phang sought relief with respect to (i) the redaction of several emails; (ii) the redaction of several DOJ charging documents; (iii) the withholding of several documents known to exist from non-Epstein-library sources; (iv) the failure to publish the mandatory redaction log; and (v) the decision not to review foreign-language documents. R.9.

To establish likely standing and irreparable harm, Phang submitted a lengthy sworn declaration. R.9-2. That declaration detailed how the challenged deficiencies were (i) causing her informational injury by stymying her reporting and (ii) causing her financial loss by preventing her from publishing additional revenue-generating episodes that she would otherwise publish. R.9-2:5–6.

### B. The Attorney General elected not to defend his substantive compliance with the Act.

The Attorney General opposed the preliminary injunction but elected not to argue that he had complied with the Epstein Act. R.12. Instead, the Attorney General staked his defense on gatekeeping arguments: that Phang lacked standing, that she lacked a valid cause of action under the APA, and that sovereign immunity barred her suit. *See* R.12:12–31. Even as to those issues, the Attorney General asserted his defenses as a matter of law without contesting the substance of Phang's sworn declaration. *See, e.g.*, R.12:17–19.

### C. The District Court granted Phang a preliminary injunction that required the Attorney General to begin reviewing and producing foreign-language documents.

The District Court granted Phang's request for a preliminary injunction on June 25. Add.1.

The court first considered and rejected the Attorney General's gatekeeping arguments. Regarding standing, the court held that Phang's declaration demonstrated uncontroverted informational and economic injuries that were traceable to the Attorney General's conduct and redressable by injunctive relief. Add.23–31. The court held that Phang had a right of action under the APA's "contrary to law" and "arbitrary

and capricious" provisions. Add.20–21 (citing 5 U.S.C. § 706(2)(A)). And the court rejected the Attorney General's argument that FOIA provided a preclusive alternative remedy, explaining that the Epstein Act was broader than FOIA and required relief beyond what Phang could obtain under FOIA. Add.31–37. The court also noted record evidence that DOJ had elsewhere invoked the Epstein Act to *reject* FOIA requests for materials covered by the Act. Add.33–34.

Turning to the *Winter* standard, the District Court first determined that Phang was likely to succeed on the statutory merits for the straightforward reason that the Attorney General had not contested her arguments. Add.38. The court thus held the substantive violation of the Epstein Act to be "conceded" under *Texas v. United States,* 798 F.3d 1108, 1110 (D.C. Cir. 2015). *Id.* The court next determined that Phang had shown irreparable harm, finding Phang established both the time-sensitive nature of her reporting and that delay would result in economic loss not redressable by damages. Add.42–44. And the court held that the equities and public interest favored preliminary relief. Add.46–48.

As to relief, Phang requested that any order to remove redactions or produce withheld records be granted in the form of a show-cause order,

rather than an order to immediately produce. *See* R.9-1:35–36. Phang took this unusual step—cabining her own relief—to eliminate the risk of inadvertent disclosure of sensitive victim information.

The District Court honored Phang's request, ordering the Attorney General to produce certain documents and remove certain redactions, but allowing the Attorney General to show cause if particular documents should not be produced or particular redactions should not be removed. Add.1–2.

By contrast, the relief as to foreign-language records was not phrased in the same show-cause terms. Rather, Phang requested, and the District Court granted, an order requiring the Attorney General to "initiate review and production of foreign-language materials that may be subject to production under the Epstein Files Transparency Act, and provide notice to the Court and all parties that such review is underway." Add.2. Full stop. The court also set a date-certain deadline—July 2, 2026—for compliance with that and its other instructions. Add.1.

In his opposition brief, the Attorney General had included a cursory paragraph asking that relief be stayed for either 60 or 7 days so that DOJ could "determine whether further appellate review is warranted" or at a

minimum "determine whether to seek emergency appellate review." R.12:30. The District Court declined to grant either request, noting (among other things) that review and production of foreign-language documents was already more than six months overdue. Add.50.

### D. Without seeking a stay, the Attorney General defied the District Court's order for nearly three months.

The Attorney General did not move for a stay pending appeal of his obligation to begin reviewing foreign-language documents. Yet he also failed to give notice that such review was underway by the July 2 deadline. Instead, in a document styled "Response to Order to Show Cause," the Attorney General cited his previous representation to Congress that the "first-level" review of foreign-language documents "was not practicable." R.19:14. He then attempted to relitigate the PI merits, arguing that the court "should not supplant Congress's acceptance of [his] explanation" and disputing whether the court even had "authority to do so." *Id.*

At a hearing on August 13, the court confirmed in no uncertain terms that the foreign-language review order was not contingent. When the Attorney General's counsel requested "a clear, clean order that directs the Department to do something by a particular [date]," the court

responded, "I've done that." S.-Add.26. Expounding, the court explained that it had "ordered the defendant to, quote, initiate review and production, review and produce foreign language materials that may be subject to production under the [Act], and provide notice to the Court and all parties that such review is underway." S.-Add.29. But counsel doubled down on defiance, attempting to relitigate standing and denying that the PI order was "a final order because of all of the 'show-cause' contingencies in it." S.-Add.32.

### E. The District Court entered an enforcement order giving the Attorney General one week to initiate review of foreign-language documents.

On September 16, the District Court entered an order to enforce the Attorney General's compliance with the PI order. Add.51. With respect to the foreign-language record review, the court rejected the Attorney General's rationales for his ongoing noncompliance. In particular, the court noted that its earlier order "did not give Defendant the option to show cause why he could not comply with the foreign-language materials portion of the order." Add.64–66. Although the court determined that a civil contempt finding was "premature," Add.65, it reminded the Attorney General that contempt was within its enforcement authority, Add.66.

The court then ordered the Attorney General to "initiate review and production of foreign-language materials" by September 24, 2026. Add.69.

### F. The District Court declined to grant a stay of the enforcement order pending appeal.

Late on Friday, September 18, the Attorney General moved for a stay of the enforcement order's command to begin review of foreign-language documents by September 24. R.46. But the Attorney General did not comply with D.D.C. Local Civil Rule 7(m)—requiring a good-faith attempt to meet and confer about all nondispositive motions—before filing. *See* R.46:1; R.47:2–3.

The District Court declined the request for a stay. Add.71–75. Although it rested that denial principally on the Attorney General's violation of LCvR 7(m), the court indicated that it also would have denied the request under the equitable standard. Add.74. The court imposed a temporary administrative stay to facilitate this Court's review of an expedited motion for stay pending appeal. *Id.*

## ARGUMENT

### I. The Court should dismiss appeal No. 26-5334 for want of jurisdiction.

#### A. The enforcement order is not an appealable order.

The Attorney General bears the burden to establish appellate jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Under 28 U.S.C. § 1292(a)(1), a subsequent order "modifying" an injunction is subject to immediate interlocutory review. But this exception is construed "narrowly" to avoid turning "the barrier against piecemeal appeals into Swiss cheese." *Wash. Metro. Area Transit Comm'n v. Reliable Limousine Serv., LLC*, 776 F.3d 1, 9 (D.C. Cir. 2015) (citation modified). A subsequent order is thus appealable only if it "actually changes the legal relationship of the parties." *Id.* The critical inquiry is whether the party challenging the order "was *already* bound by the . . . injunction." *Id.*

Under this standard, the Court lacks jurisdiction over the Attorney General's appeal from the September 16 order enforcing the PI order. When the District Court entered that order, the Attorney General was "already bound" by the PI order. That earlier order commanded him by July 2 to "initiate review and production of foreign-language materials

that may be subject to production under the [Epstein Act], and provide notice to the Court and all parties that such review is underway," without providing the option to show cause. Add.2. The September enforcement order imposed no new obligations—its operative foreign-language review direction is identical to the PI order's, save for the change in dates. *Compare* Add.2 *with* Add.69.

The Attorney General nevertheless denies there was a "definitive resolution of the foreign language documents issue" until the District Court issued the enforcement order on September 16. Mot.10. The Attorney General has never identified any authority supporting that contention, and he mischaracterizes the proceedings below. The District Court addressed the Attorney General's noncompliance with the PI order more than a month earlier, at the August 13 hearing. There, the court repudiated the Attorney General's assertion that he was not obligated under the PI order to begin review of foreign-language documents. *See* S.-Add.29–32. And insofar as the Attorney General found the original PI order ambiguous, he should have "petitioned the District Court for a modification, clarification or construction of the order"; in making his

"own determination of what the decree meant," he acted "at [his] peril." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949).

The Attorney General also asserts that the District Court "did not require immediate action by the government—or at least did not enforce any such requirement" after he failed to satisfy his obligation by the deadline set forth in the PI order. Mot.8. This excuses nothing. A party subject to an injunction must "obey that decree until it is modified or reversed" even if it has "proper grounds to object to the order." *GTE Sylvania, Inc. v. Consumers Union*, 445 U.S. 375, 386 (1980).

Because the enforcement order did not change the legal relationship of the parties, the appeal from that order in No. 26-5334 should be dismissed. *See, e.g.*, *AIDS Vaccine Advoc. Coal. v. Dep't of State*, No. 25-5046, 2025 WL 621396, at *1 (D.C. Cir. Feb. 26, 2025).

### B. The appeal of the enforcement order is an improper attempt to expand the record on appeal of the preliminary injunction order.

The Attorney General, a sophisticated litigant, likely realizes that the enforcement order is not immediately appealable. By nonetheless appealing it, the Attorney General appears to be trying to embellish the PI record. Plainly, the Attorney General is unhappy with the arguments

he advanced in his PI opposition. During the lengthy period when he was in default of his obligations under the PI order, he took every opportunity he could to raise new arguments. *See, e.g.*, R.19; R.22; R.25; R.28. And, as discussed below, he now leans heavily on several of those arguments—which have been forfeited—to ground his claim of likely success on appeal. The Court should not countenance such tactics.

## II. The Court should deny the motion for a stay pending appeal.

"A stay pending appeal is an extraordinary remedy." *KalshiEX LLC v. CFTC*, 119 F.4th 58, 63 (D.C. Cir. 2024) (citation modified). "To obtain such exceptional relief, the stay applicant must (1) make a 'strong showing that [it] is likely to succeed on the merits'; (2) demonstrate that it will be 'irreparably injured' before the appeal concludes; (3) show that issuing a stay will not 'substantially injure the other parties interested in the proceeding'; and (4) establish that 'the public interest' favors a stay." *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). The Attorney General should not be granted a stay here.[2]

---

[2] There is a serious question whether the Attorney General properly exhausted under Federal Rule of Appellate Procedure 8(a)(2)(A). The Attorney General seeks to stay the PI order, *see* Mot.27—and for good reason, as that order creates his obligation to review foreign-language documents. But his September 18 motion sought to stay only the

### A. The Attorney General is not likely to prevail on the merits of his appeal of the preliminary injunction order.

#### 1. Phang has standing.

The District Court correctly found that Phang likely has standing on two separate bases: *first*, Phang has likely suffered a cognizable informational injury; and *second*, her economic injuries (the substance of which the Attorney General did not contest) are likely redressable. Add.23–31. As he did below, the Attorney General all but ignores Phang's uncontroverted economic injuries, and his arguments regarding informational injury have been rejected by both this Court and the Supreme Court. The Attorney General is not likely to prevail on standing.

***Economic injury.*** The District Court found that Phang established likely economic injury in the form of lost revenue traceable to the Attorney General's Epstein Act violations. Add.29–30. Economic loss is "a classic form of concrete and particularized harm" that may ground standing for an APA claim. *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d

---

enforcement order. *See* R.46. And his prophylactic request for a stay in his June PI opposition brief was neither a motion nor a request for stay *pending appeal*. *See* R.12:30. *But see* Fed. R. App. P. 8(a)(2)(A) (requiring a motion). Doubts aside, Phang will treat the exhaustion requirement as satisfied in the interest of prompt resolution of the stay dispute.

4, 9 (D.C. Cir. 2015); *see also CREW v. OMB*, 791 F. Supp. 3d 29, 51 (D.D.C. 2025).

The Attorney General does not argue that the District Court's factual finding was clearly erroneous. Nor is any such argument likely to succeed in the merits appeal. Phang's Epstein reporting reliably draws hundreds of thousands of viewers, earning Phang thousands of dollars in revenue that she can track episode-by-episode. R.9-2:6–7. But the Attorney General's illegal actions have denied Phang access to certain Epstein documents, preventing her from publishing additional episodes reporting on those documents. *Id.* For instance, Phang is, for obvious reasons, unable to report on the full scope of Epstein's transnational sex-trafficking operation without access to any foreign-language documents. As a consequence of that omission and others, Phang has lost out on thousands of dollars in revenue. *Id.*

Invoking *Diamond v. Charles*, 476 U.S. 54, 66 (1986), the Attorney General dismisses Phang's concrete, unrefuted account of pocketbook injury as "speculation." Mot.23 (quoting *Diamond*). But *Diamond* concerned a pediatrician's allegation that abortions were causing him economic loss because the unborn fetuses might grow up to be his

patients. 476 U.S. at 66. No doubt such a claim is "speculative"; Phang's concrete accounting of lost revenue from specific stories she would already have reported but for the Attorney General's violations of the Act is anything but.

***Informational injury.*** The Attorney General devotes more space to challenging Phang's informational injury, but his arguments fare no better. The Supreme Court has established that a plaintiff "suffers an 'injury in fact' when [she] fails to obtain information which must be publicly disclosed pursuant to a statute." *FEC v. Akins,* 524 U.S. 11, 21 (1998). To demonstrate such informational injury, a plaintiff must show that she (i) "has been deprived of information that, on [the court's] interpretation, a statute requires the government or a third party to disclose to [her]," and (ii) "suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016).

The District Court correctly held that Phang satisfies both prongs of this standard. Add.25–29. First, the court found that the Epstein Act "requires the information to be disclosed to [Phang] as part of the public

at large, and the Attorney General's alleged failure to comply with the law deprives her of this information." Add.25–27. Second, the court found that Phang "is suffering the type of harm—lack of transparency—that Congress sought to prevent" by enacting the Epstein Act. Add.29. The court credited the concrete and undisputed harms Phang identified: her inability to report "half a dozen stories" due to the Attorney General's violations of the Act, and downstream harms to victims and the public denied the benefit of her reporting. Add.28.

The Attorney General ignores both the District Court's findings and the settled framework for informational standing. Instead, he argues that Phang lacks standing because she fails to "identify any particularized right" the Act grants to *her specifically*, not just the public at large. *See* Mot.21–22.

Both the Supreme Court and this Court have rejected this line of argument. That "other citizens or groups of citizens might make the same complaint after unsuccessfully demanding disclosure under [a statute] does not lessen [a plaintiff's] asserted injury." *Pub. Citizen v. DOJ*, 491 U.S. 440, 449–50 (1989). Nor does that fact render a claim "an

impermissible generalized grievance." *Pub. Citizen v. NHTSA*, 489 F.3d 1279, 1292 (D.C. Cir. 2007).

District courts routinely apply these authorities to vindicate the informational injuries of journalists, who, like Phang here, suffer harms from nondisclosure distinct from those of the public at large. For instance, one journalist had standing where agency nondisclosure "stymied" his research "into [a certain drug's] safety and effectiveness," *Seife v. HHS*, 440 F. Supp. 3d 254, 268, 272–73 (S.D.N.Y. 2020); *see also, e.g.*, *Pub. Citizen v. Carlin*, 2 F. Supp. 2d 1, 5–6 (D.D.C. 1997), *rev'd on other grounds*, 184 F.3d 900 (D.C. Cir. 1999). The fact that a statute "entitles the public generally to the disclosure of" information "does not mean that the informational injury . . . is not particular to" a person uniquely affected by the disclosure. *EPIC v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 311 (D.D.C. 2017).

Against these authorities, the Attorney General invokes *United States v. Richardson*, 418 U.S. 166, 176 (1974), to argue that Phang "impermissibly advances a 'generalized grievance' that the government is not complying with the law." Mot.19–20 (quoting *Richardson*). But *Richardson* is a case rejecting taxpayer standing to enforce the

Statement and Account Clause. *See* 418 U.S. at 167–68. And *Akins*, the Supreme Court's seminal informational standing case, rejects the view that *Richardson*'s "generalized grievance" rule precludes individual standing to enforce public-disclosure statutes. *See Akins*, 524 U.S. at 23. In *Akins*, the FEC made the same argument the Attorney General makes here. The Court repudiated it, holding that "where a harm is concrete, though widely shared," there is "injury in fact." *Id.* at 24.

The Attorney General's remaining authorities are far afield. *Medina v. Planned Parenthood South Atlantic* concerns causes of action under the Spending Clause, not Article III standing in disclosure litigation. *See* 606 U.S. 357, 364–68 (2025). The availability of a cause of action is a statutory question, not to be conflated with Article III standing analysis. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). And *Prisology, Inc. v. BOP*, the Attorney General's only other authority, stands only for the sound rule that a plaintiff who alleges no injury whatsoever lacks standing. *See* 852 F.3d 1114, 1116–17 (D.C. Cir. 2017).

### 2. Phang has a right of action under the Administrative Procedure Act.

The District Court correctly ruled that Phang has an APA right of action through which she may enforce the dictates of the Epstein Act. Add.20–21. The APA creates a private right of action for persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. As just explained, Phang is adversely affected by the Attorney General's violations of the Act, the "relevant statute." DOJ is an agency and the Attorney General has conceded that its production of documents was "final agency action." Add.21. And neither the Epstein Act nor any other law provides a more "specific statutory review provision" that would preclude APA review. *Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 18 (D.C. Cir. 2006). The straightforward conclusion, and the one the District Court reached, is that Phang may invoke the section 702 "generic cause of action," *id.*, to test the Attorney General's compliance with the Act.

***Section 701(a)(1) preclusion.*** Resisting this conclusion, the Attorney General first argues that the Epstein Act itself precludes review under 5 U.S.C. § 701(a)(1). Mot.14. This argument fails.

For starters, it is forfeited. The argument that the lack of a private right of action in the Epstein Act *by itself* triggers section 701(a)(1) is new and different from any argument made below. *Contrast* Mot.14–15 *with* R.12:16–17 (noting that Phang lacks a private right of action under the Epstein Act); R.12:19–22 (arguing that FOIA precludes APA review per 5 U.S.C. § 704). The longstanding rule of this Court is that "issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal." *District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984); *see, e.g.*, *Ellipso, Inc. v. Mann*, 480 F.3d 1153, 1157 (D.C. Cir. 2007) (applying this forfeiture rule in appeal of preliminary injunction).

Regardless, the argument fails on its merits. The Attorney General asks this Court to infer from the lack of an Epstein Act–specific right of action that Congress meant to preclude judicial enforcement of the Act. But the opposite inference is far more sensible—Congress recognized that the Epstein Act would be privately enforceable via APA section 702 suits and so saw no need for a separate Act-specific private suit provision. "Congress rarely intends to prevent courts from enforcing its directives to federal agencies." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486

(2015). Thus its "mere failure to provide specially by statute for judicial review is certainly no evidence of intent to withhold review." *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 671 (1986).

This Court's precedents confirm that a statute without a right of action is the ordinary case for APA review, not an indication that review is precluded. *See, e.g.*, *Fund for Animals*, 460 F.3d at 18. By contrast, the Attorney General's novel logic would preclude APA review of agency compliance with many federal statutes under which APA litigation is routine—most prominently, the National Environmental Policy Act. This Court has held otherwise: "because NEPA creates no private right of action, challenges to agency compliance with the statute must be brought pursuant to the Administrative Procedure Act." *Karst Envtl. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1295 (D.C. Cir. 2007); *see also Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 551 (D.C. Cir. 1993).

The Attorney General's citations undermine his theory. *United States v. Fausto* held that certain non-APA statutory remedies were precluded by the "elaborate" review provisions of the Civil Service Reform Act, which expressly provided for judicial review of some but not all civil-service employee claims. 484 U.S. 439, 443–44 (1988). Similarly, *United*

*States v. Erika, Inc.*, rejected court of claims review of Medicare Part B claims based on a statute providing for express review only of Medicare Part A claims. 456 U.S. 201, 209–11 (1982). And *Block v. Community Nutrition Institute* identified "a detailed mechanism for judicial consideration of particular issues at the behest of particular persons" as the gravamen of this species of preclusion. 467 U.S. 340, 349 (1984). The laws at issue in *Fausto*, *Erika*, and other preclusion cases evince such a "detailed mechanism"; the Epstein Act plainly does not. Thus, even had this argument not been forfeited, it would fail.

***FOIA preclusion.*** The Attorney General next argues that FOIA precludes section 702 review because it is an "adequate remedy" in the terms of APA section 704. Mot.15. This argument fails for the many reasons identified by the District Court.

Section 704 does not bar review where the alternative offers only "doubtful and limited relief." *Bowen v. Massachusetts*, 487 U.S. 879, 901 (1988); *see CREW v. DOJ*, 846 F.3d 1235, 1245 (D.C. Cir. 2017). Here, as the District Court recognized, the Epstein Act's disclosure is "strikingly broad," while FOIA, a narrower and "fundamentally different disclosure law," cannot provide Phang "with an adequate remedy." Add.31–32.

Indeed, the District Court concluded that FOIA likely would not afford Phang *any* of the preliminary relief she sought under the Act. FOIA exemptions 6 and 7 would prevent disclosure of redacted names; those exemptions plus exemption 3 would block her from obtaining charging documents; and the redaction-log claim would be dead on arrival because FOIA does not compel the creation of new documents. Add.32–33. And most pertinent here, a request that DOJ review all foreign-language documents relating to Epstein would likely be denied on its face as unduly burdensome. *Id.*

Bolstering the District Court's conclusion that FOIA would provide only a "doubtful and limited" remedy, record evidence—which the Attorney General has yet to address, despite a court order to do so, Add.34 n.6—establishes that DOJ's current policy is to respond to FOIA requests for Epstein Act materials with boilerplate denial letters. Add.33. Contrary to its current argument, DOJ asserts in those letters that the Act "directed a much broader and less redacted release of the files than would have been made under the FOIA." R.14-1:6, 10.

Even in his brief, the Attorney General admits that "Phang cannot get the documents she seeks" under FOIA. Mot.16. But he argues that

fact makes no difference because all he must show to invoke section 704 is that FOIA provides the "same genre" of remedy as Phang seeks. Mot.17 (quoting *Chaverra v. ICE*, Civ. A. No. 18-289, 2018 WL 4762259, at *4 (D.D.C. Oct. 2, 2018)).

This fallback argument fails for two reasons. First, with respect to the Epstein Act, FOIA does *not* afford Phang the "same genre" of remedy as the APA. Phang's remedy under APA section 702 is judicial review of final agency action that was mandated by statute. And the agency action mandated by the Epstein Act encompasses far more than disclosure. DOJ was required to exhaustively search its and its subagencies' records, to apply a strictly delineated set of withholding and redaction criteria, to affirmatively disclose all resulting covered records to the general public for free, and to create and publish detailed documentation of its processes. FOIA, by contrast, requires disclosure of records covered by a request to a fee-paying requester, so long as none of its many broad exemptions or exclusions applies. On their face, these remedies are not of the "same genre."

Second, and in keeping with a theme, the Attorney General's citations undermine his argument. *CREW* holds only that FOIA provides

an adequate remedy to enforce a provision of FOIA itself, and stakes that holding on the Court's determination that the plaintiff could have "gain[ed] access to all the records it [sought]" via FOIA. 846 F.3d at 1245–46. The district court opinions in *Chaverra*, 2018 WL 4762259, at *3, and *Ray v. BOP*, 811 F. Supp. 2d 245, 250–51 (D.D.C. 2011), likewise reject attempts to enforce *FOIA itself* through the APA. These cases only confirm that the District Court properly considered whether Phang would be able to access the records she seeks via FOIA. They may also establish that the APA generally is not available to enforce *FOIA*, but they in no way support the far broader rule that a plaintiff may never invoke the APA to enforce an agency obligation in any way related to disclosure.

***Preclusion via unenacted legislation.*** In a last-ditch move, the Attorney General invokes a pending bill, the Epstein Files Transparency Act II. Mot.18–19. This argument should be rejected out of hand: It is not "appropriate to stay a lower court judgment in light of unenacted legislation" because a court's "task is to rule on what the law is, not what it might eventually be." *Leal Garcia v. Texas*, 564 U.S. 940, 941 (2011) (per curiam). And as the Attorney General admits, the bill's proponents

indicated that they intend the cause of action it would create to be "cumulative of, and in addition to" existing causes of action. Mot.18 (quoting H.R. 9694, 119th Cong. § 4(a)(5) (2026)). More generally, the bill's text contradicts many of the positions the Attorney General has taken in this action (for instance, it confirms that he was required to publish a full redaction log, not just a summary). And at least one of the bill's sponsors has spoken in support of Phang's lawsuit.[3] The bill plainly is not meant to deprive Phang of her cause of action; if anything, it aims at undercutting the Attorney General's arguments against relief.

### 3. The Attorney General conceded his substantive violation of the Epstein Act with respect to foreign-language documents.

The statutory merits are conceded for purposes of the Attorney General's appeal of the PI order. The Epstein Act prescribes specific and limited bases for withholding responsive documents. Act § 2(c)(1)(A)–(E). A foreign-language tag is not among them, and the Act does not authorize the Attorney General to establish new withholding bases by invoking practicality. The Attorney General never argued otherwise below,

[3] Ro Khanna, X.com, https://x.com/RoKhanna/status/2048835686166409464 (last edited 1:44 PM Apr. 27, 2026).

conceding the issue, and he has not sought to overcome that forfeiture here.

#### 4. The District Court applied the correct APA standard.

The Attorney General also insists that the District Court improperly ordered affirmative relief under 5 U.S.C. § 706(2), which allows courts to set aside unlawful agency action, rather than relying on section 706(1), which allows courts to compel agency action. Mot.24–26. As an initial matter, by raising this argument for the first time in his motion to stay in the District Court, R.46-1:19–23, the Attorney General forfeited it, *see League of Women Voters v. DHS*, No. 26-5243, 2026 WL 2643439, at *1, 5–6 (D.C. Cir. Sept. 4, 2026) (holding that the government forfeited "its central arguments" by raising them for the first time in stay briefing, then declining to excuse the forfeiture).

Regardless, the Attorney General's "cramped view of remedies under the APA misstates the law." *See Haitian Bridge All. v. Biden*, No. 21-cv-3317, 2026 WL 627405, at *12 (D.D.C. Mar. 6, 2026). As this Court has explained, while "vacatur" is the "ordinary" remedy in section 706(2) cases, a court can compel agency action if it "determine[s] that an injunction should issue under the traditional four-factor test." *Standing*

*Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1050, 1054 (D.C. Cir. 2021); *see also* 5 U.S.C. § 703 (providing for review through "any applicable form of legal action, including . . . writs of prohibitory or mandatory injunction"). Plaintiffs regularly seek—and courts regularly award—precisely that relief for claims brought under section 706(2). *See Ramirez v. ICE*, 568 F. Supp. 3d 10, 22–24 (D.D.C. 2021) (collecting cases).

Here, the Attorney General has not disputed that he made a final decision not to review or produce any "foreign-language document[s]," because first-level responsiveness review was "not practicable." *See* R.9-3:128, 132; Mot.25. Given that the Attorney General further conceded (by silence) that his decision violated the Act, the District Court properly held that Phang was likely to succeed on the merits of her claims under section 706(2) and entered an order requiring him to comply with his statutory obligations. Add.37–38.

And had the District Court erred in applying section 706(2), such error would be harmless—section 706(1) mandates the same outcome. The Act commands the Attorney General to produce "*all*" materials that "relate to" certain specified subjects. Foreign-language materials are not

covered by the statutory exemptions. *See* Act §§ 2(a), (c)(1)(A)–(E). And the Attorney General cannot "impl[y]" such "additional exceptions" where "Congress explicitly enumerated certain exceptions." *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–17 (1980). Nor may he claim administrative impracticability to excuse his mandatory statutory duty. A "policy disagreement with Congress[]" is not "a lawful ground" for an agency to decline its "congressionally mandated" obligations. *In re Aiken County*, 725 F.3d 255, 260 (D.C. Cir. 2013).

The Act unequivocally requires the Attorney General to review foreign-language materials, and the Attorney General has refused to do so. Thus, even under section 706(1), the District Court could have compelled the Attorney General to act. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63–64 (2004). The section 706(1) delay cases the Attorney General cites, Mot.26, are inapposite. There is no arguing that review is simply *delayed* here—were that the case, the request for a stay would be curious.

**5. The District Court did not improperly grant "full relief."**

The Attorney General argues that the District Court improperly granted Phang "full relief." Mot.23–24. This argument, yet again, is

forfeited as it was not made in the PI briefing. *League of Women Voters*, 2026 WL 2643439, at *1.

It is also demonstrably false. As ultimate relief in this case, Phang seeks to compel production of "all materials that have not been produced but should be," declaratory relief, and the appointment of a special master to oversee compliance. Add.16. Phang will have the opportunity to obtain that "full relief" only after she has (i) reviewed the Attorney General's productions of any foreign-language documents, (ii) assessed whether his disclosures comply with the Act, and (iii) litigated any challenges to improper withholdings or redactions.

DOJ's review and production of foreign-language documents is a necessary first step toward full relief, nothing more. It was thus well within the recognized authority of a district court to shape preliminary relief. *See, e.g.*, *Ctr. for Pub. Integrity v. DOD*, 411 F. Supp. 3d 5, 10 (D.D.C. 2019) (granting PI requiring initial FOIA processing to follow a certain schedule); *Washington Post v. DHS*, 459 F. Supp. 2d 61, 66, 68 (D.D.C. 2006) (rejecting full relief defense where "the propriety of any exemption claims . . . remain[ed] to be litigated.").

### B. Grant of a stay will cause irreparable harm to Phang.

In a detailed six-page discussion, the District Court found that the Attorney General's uncontested violations of the Act were causing Phang ongoing and irreparable informational and economic injuries. Add.38–44. The Attorney General's months of default have compounded those injuries, and grant of a stay would perpetuate them further. DOJ's statutory deadline to *complete* review and production of all covered documents passed in December 2025. If a stay is granted, review of foreign-language documents is not likely even to *begin* until more than a year after that deadline. That delay will render any disclosed information "stale," vitiating the utility those documents could otherwise have to Phang's time-sensitive reporting. *Payne Enters., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988); *see Edmonds v. FBI*, 417 F.3d 1319, 1324 (D.C. Cir. 2005).

The Attorney General does not contest the District Court's finding of irreparable harm. Instead, he gestures briefly toward an argument made below, that Phang delayed in seeking preliminary relief. Mot.26. The District Court rightly disagreed, reasoning that "the volume of documents" Phang had to review, coupled with "the failure of the

Attorney General to publish the redaction log"—which made Phang's review far more cumbersome—rendered the motion timely. Add.45–46. The Attorney General offers no reason to displace this sound analysis.

### C. Denial of a stay will not harm the Attorney General.

The Attorney General makes irreparable harm his lead argument, yet it may be his weakest. All he must immediately do if a stay is not granted is begin reviewing foreign-language documents. No immediate disclosure is required. To be sure, disclosure must follow, but only after review and insofar as required by the Act. And when disclosure does begin, the Attorney General will be entitled to withhold or redact otherwise-covered records on any of the grounds prescribed by the Act. The Attorney General will not be irreparably harmed by beginning a review process that is nine months overdue. Nor will he be irreparably harmed if, in the course of that process, he identifies and discloses records that he himself determines should by law be produced.

Citing FOIA case law about immediate production of documents, the Attorney General argues that an order to disclose creates *per se* irreparable harm because disclosure is irreversible. Mot.12–13. This

argument fails. It cannot logically warrant a stay of *review*, which does not necessitate subsequent disclosure.

And as to disclosure, this irreversibility argument ignores the basis of the Attorney General's own decision to forgo foreign-language record review. He determined that DOJ did not need to *review* foreign-language documents, citing the practical difficulties of first-level review. But he has never asserted—and cannot do so now—that insofar as DOJ (i) in fact reviews foreign-language documents and (ii) determines them to be subject to disclosure under the Act, it may nonetheless withhold them.

This key nuance distinguishes the cases holding production to be irreversible. In those cases, the government disputed its substantive disclosure obligation. *See, e.g.*, *Ctr. for Nat'l Sec. Studies v. DOJ*, 217 F. Supp. 2d 58, 58 (D.D.C. 2002). Here, by contrast, the Attorney General will only produce documents that *he* (not the court) reviews and *he* (not the court) concludes must be disclosed by law. To call such disclosure an irreparable harm would, with respect, be bizarre.[4]

[4] Of course, after initial review, the parties may disagree about whether certain foreign-language documents have been properly redacted or withheld. But Phang acknowledges that such disputes will need to be resolved through further litigation.

In any case, the claim of irreparable harm fails for two other reasons. First, the Attorney General has not met his burden as movant to show harm with particularity. He has never substantiated his assertions about the burdens of review or scope of potential production with any evidence or specifics. In his stay brief below, the Attorney General claimed without basis that review would involve "thousands of documents that are in different foreign languages." R.46-1:23. But even that naked assertion is conspicuously absent from his motion to this Court. And as the Court reminded the government just months ago, a party seeking the extraordinary relief of a stay must make a far more robust showing of harm than that. *Beatty v. Trump*, No. 26-5224, 2026 WL 1970557, at *1 (D.C. Cir. July 8, 2026) (per curiam); *see* Fed. R. App. P. 8(a)(2)(B)(ii).

Second, the Attorney General has not acted with the requisite haste. He delayed almost three months in seeking a stay, electing instead to willfully misread and defy an unambiguous court order. And far from seeking this Court's expedited review, he waited until the last possible day to notice his appeal of the PI. R.35. Such delay "vitiates much of the force" of a stay movant's "allegations of irreparable harm." *Beame v.*

*Friends of the Earth*, 434 U.S. 1310, 1313 (1977) (Marshall, J., in chambers); *see, e.g.*, *N.H. Youth Movement v. Scanlan*, No. 26-1740, 2026 WL 2620381, at *1 (1st Cir. Sept. 4, 2026) ("An unreasonable delay alone may be sufficient grounds to deny a stay."); *cf. Kingdom v. Trump*, No. 26-5181, 2026 WL 1905418, at *3 (D.C. Cir. June 17, 2026) (Pillard, J., dissenting from grant of stay).

### D. The balance of equities and public interest weigh against a stay.

The District Court correctly concluded that the balance of equities and public interest considerations favored the grant of the preliminary injunction. Add.46–48. The same considerations counsel against any stay. "The Epstein Act requires the Attorney General to publicly disclose the documents that are covered by it; complying with the law does not harm the Attorney General." Add.47. This Court recognizes "a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations"; by contrast, there is "no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citation modified).

The Attorney General has already granted himself a nine-month reprieve from his statutory obligation to review the documents in dispute, and a three-month stay-by-defiance of his court-ordered obligation to do so. The balance of equities and public interest do not favor a stay that will allow him to perpetuate his lawless conduct yet further.

## CONCLUSION

The Court should deny the motion for a stay pending appeal and grant the cross-motion to dismiss the appeal in Case No. 26-5334.

Respectfully submitted this 25th day of September, 2026,

*/s/ Samuel T. Ward-Packard*

**PUBLIC INTEGRITY PROJECT**
Brendan Ballou
D.C. Bar No. 241592
Emily Gilman
D.C. Bar No. 1740641
Samuel T. Ward-Packard
D.C. Bar No. 90005484
ballou@publicintegrityproject.org
emily@publicintegrityproject.org
sam@publicintegrityproject.org
(917) 684-3900

*Counsel for Plaintiff-Appellee Katie Phang*

## CERTIFICATE OF COMPLIANCE

This combined motion and response complies with the type-volume limit of Federal Rule of Appellate Procedure 27, as modified by D.C. Circuit Rule 27(c), because it contains 7,736 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f). This motion also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)–(6) because it was prepared using Microsoft Word in 14-point Century Schoolbook, a proportionally spaced typeface.

Respectfully submitted,

*/s/ Samuel T. Ward-Packard*

# SUPPLEMENTAL ADDENDUM

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KATIE PHANG,<br>Plaintiff, | Civil Action<br>No. 1:26-1417 |
| vs. | August 13, 2026<br>Washington, DC |
| TODD BLANCHE,<br>Defendant. | 1:13 p.m. |

---

TRANSCRIPT OF STATUS CONFERENCE AND ORAL ARGUMENT
**BEFORE THE HONORABLE EMMET G. SULLIVAN**
UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

**For the Plaintiff:** **Emily Gilman**
**Brendan Ballou**
PUBLIC INTEGRITY PROJECT
1763 Columbia Road NW, Suite 175
Washington, DC 20009
emily@publicintegrityproject.org
brendan@publicintegrityproject.org
sam@publicintegrityproject.org

**For the Defendant:** **Andrew Block**
DOJ-OAAG
950 Pennsylvania Ave., NW
Washington, DC 20530
Email: andrew.block@usdoj.gov

**Saifuddin Kalolwala**
DOJ-USAO-Civil Division
601 D Street NW
Washington, DC 20530
saifuddin.kalolwala@usdoj.gov

**Reported By:** **Lorraine T. Herman, RPR, CRC**
Official Court Reporter
U.S. District & Bankruptcy Courts
333 Constitution Avenue NW
Washington, DC 20001
lorraine_herman@dcd.uscourts.gov

*** Proceedings recorded by stenotype shorthand.
*** Transcript produced by computer-aided transcription.

**P R O C E E D I N G S**

**DEPUTY CLERK:** Your Honor, this is civil action 26-1417, *Katie Phang vs. Todd Blanche*.

Will parties please come forward to the lectern and identify yourself for the record this afternoon. We will start with plaintiff's counsel first.

**MS. GILMAN:** Your Honor, Emily Gilman for plaintiff, Katie Phang, who is present. And also at counsel table is Brendan Ballou.

**MR. BLOCK:** Good afternoon, Your Honor. My name is Andrew Block, on behalf of the Department of Justice. I'm with the Associate Attorney General's Office.

With me at counsel's table is Saifuddin Kalolwala, from the U.S. Attorney's Office for the District of D.C. Civil Division, as well as Garrison Grisedale, also with me in the Associate Attorney General's Office.

**THE COURT:** Okay. Good afternoon.

I scheduled a status hearing to discuss issues arising out of the defendant's responses to the Court's order of June 25th and the July 25th directing the production of documents for in-camera review.

In the in-camera review order, the Court directed the defendant to provide documentation supporting his representation that certain names that have been redacted in the published version of certain documents are indeed the

names of the victims. This includes documents containing the emails and the draft indictment that was provided to the Court for its in-camera review.

In response, the defendant did not provide such documentation. Rather, he asserted in a response that certain redacted texts contains the identities of victims or potential victims whose counsel have contacted the government and requested that the persons be treated as victims.

In the Court's opinion, the defendant's assertions did not comply with the order, which includes documentation to support the assertion. So I ask defense counsel to respond to that. All the Court has requested is documentation.

**MR. BLOCK:** I'm sorry. What was that?

**THE COURT:** All the Court has requested is documentation.

**MR. BLOCK:** Right, Your Honor.

Well, we certainly appreciate the opportunity to address those concerns today. I would like to say at the outset, I think that the Department tried to make a good-faith effort to provide the Court with what it had wanted and sought. Obviously, you called the status conference, so it didn't quite happen.

But to that end, I do have with me here today a

second binder, if Your Honor is willing to entertain a secondary submission.

**THE COURT:** Sure.

**MR. BLOCK:** May I approach and address the Court briefly *ex parte*?

**THE COURT:** Yes. Hand it to Mr. Coates, yes. Let me just take a look at it quickly.

**MR. BLOCK:** Certainly, Your Honor.

**THE COURT:** What the government has done is passed up a binder to the Court. This captures materials for *ex parte* in-camera review with the Court's order and the docket number.

**MR. BLOCK:** I would say, Your Honor, that obviously, these types of documents here, they contain a lot of sensitive information that are under protective order --

**THE COURT:** Yes.

**MR. BLOCK:** -- in the Southern District of New York.

**THE COURT:** Thank you.

What I may do, I have a number of questions to ask. Being a federal judge, we always ask a lot of questions.

At the end of the questioning, I will, and my staff, take a look at this. It seems to be very comprehensive. Thank you.

So we'll talk about this on a short recess, Counsel.

**MR. BLOCK:** And there are some things I do feel that I can confidently say in open court, as to that, without necessarily going into any names. I would say what we have submitted is a representative sample.

You will note in the attorney review protocol that is on the Department's website, it's the memo dated January 4th; that set forth the Department's procedure for affording people "victim status."

So on the range of people who were redacted as victims' names, there is going to be a sliding scale of documentation available to the Department that would be able.

The Department didn't weigh the amount or the volume of documentation when affording somebody victim status. What the Department took was the representation from a victim or their counsel, self-identified or through counsel, that that person was a victim, and that is how the hundreds of people who applied redactions during this time, this great effort to publish all these documents in compliance with the Act, that's how those people knew to apply redactions to certain names.

**THE COURT:** Okay. Thank you.

I want to focus on the FBI interview notes at this

time.

In the preliminary injunction order, the Court ordered the defendant to produce the underlying FBI interview notes that formed the basis for certain FBI 302 interview reports with appropriate redactions, which show cause why the notes should not be produced.

In response, the defendant stated that he did not produce the notes for two reasons: One, they are, "substantially similar to" and, therefore, duplicative of the typewritten reports. And, two, there is a risk of inadvertent disclosure of victim information because the notes are handwritten.

The defendant did not point to a provision in The Epstein Act that contains an exception for, quote, substantially similar, end quote, or duplicative documents.

The defendant has acknowledged publishing, "substantially similar," draft indictments and, therefore, I request that the defendant be prepared to explain why the handwritten notes cannot be redacted manually or why the redactions cannot be accomplished in some other way.

**MR. BLOCK:** Your Honor, to the point of that, I will somewhat reiterate our briefing here, but the determination had been made that the handwritten notes were duplicative of materials already produced.

With respect to the Court's point about other

documents being duplicative, I think the Attorney General's memorandum of January 30th speaks to that, specifically on Pages 4 and 5, where it talks about duplications, potential inconsistencies and victim engagement.

There, the Attorney General noted that due to the volume of documents -- that's at the bottom of Page 4: Considering various factors, including the volume of documents reviewed, the presence of duplicative and partially duplicative documents and the number of attorney reviewers involved, inconsistencies will likely exist in how viewers apply redactions.

Now, of course, the Department's goal is to produce and achieve as much transparency as possible. Across hundreds of reviewers and even 40 second-line reviewers, this, I think, is an example of one of those inconsistencies where somebody reviewed a draft indictment and said there is no additional harm or risk of victim information.

I don't know exactly who made the decision to publish each document, right, but the decision from the Department was that the handwritten notes, as a duplicative category, they were just duplicative.

**THE COURT:** So you have no additional information; is that what you're saying?

**MR. BLOCK:** Yeah, I think so.

**THE COURT:** There must be some information.

**MR. BLOCK:** Well, I think, again, it's -- to the Court's point about --

**THE COURT:** How many pages of interview notes are we talking about?

**MR. BLOCK:** I don't have that information.

**THE COURT:** Approximately?

**MR. BLOCK:** I don't know what the volume of handwritten material underlying 302s is.

**THE COURT:** Have other handwritten notes been published?

**MR. BLOCK:** To my knowledge, not with respect to the 302s. I know the document, for instance, the Court cited had a handwritten old draft on the top of it, but I think that that's substantively different than what the Court's asking about.

**THE COURT:** So what would the cause be? The defendant was directed to show cause why it should not be produced. What's the answer?

**MR. BLOCK:** The answer, Your Honor, is that they are duplicative documents.

**THE COURT:** Well, that's what the defendant says. The Court doesn't know that.

All the Court is looking for is a means by which the Court can conclude that what's been provided is evidence

is indeed consistent with 302 reports; that's all.

The only way to do that is to --

There's some amplification here, Mark.

The only way to do it in the Court's view -- maybe there's another way to do it -- is to see the informal notes. But just to take it at face value that the notes are substantially similar doesn't really address the Court's responsibility. The Court has to determine that that's correct. I'm just looking for a way to do that.

**MR. BLOCK:** You know, Your Honor, I'm also struggling. I think that gets a little bit back to the procedural posture here, which is that on a PI posture, which is what we are in, it's -- I'm not entirely sure what Your Honor is looking for. Is there a specific direction?

**THE COURT:** I'm just looking for cooperation. I'm just looking for evidence that supports the defendant's representations that, indeed, the handwritten notes are consistent with the 302 reports; that's all.

**MR. BLOCK:** Okay.

**THE COURT:** That's all. I mean, it's simple. I know these are difficult questions, but the Court needs to have a time frame for getting that information. I'm willing to work with you. I'm willing to work with the parties, both sides. All I need is proof that what the 302 reports say is actually true and consistent with the FBI notes.

**MR. BLOCK:** So, I guess, is that an order or is there an order that the Court is thinking of entering to ask for something? I suppose when you are talking about the handwritten notes and the 302s --

**THE COURT:** I mean, correct me if I'm wrong. Normally, the process is that an agent will have notes prior to preparation and filing of a 302.

**MR. BLOCK:** Correct.

**THE COURT:** Correct. So all the Court is asking for is those notes.

**MR. BLOCK:** Right. And I suppose that the law at issue here is the EFTA, and in the review and production of those documents for public posting, the Department had determined that these documents were duplicative, so they fell outside --

**THE COURT:** The Department may well be correct, but the Court needs to be in a position to say the Court either agrees with the Department or disagrees. The only way to do that is to have some evidence produced by the defendant. Maybe there's another way to do it. I don't know. I'm open to suggestions.

**MR. BLOCK:** I think, Your Honor, I don't have much other insight to offer on this topic. I mean, I suppose I'm able to take that back. I don't know if there's an order that we can take to assess --

**THE COURT:** Well, that was part of the order that the Court issued. That was in the preliminary injunction order.

**MR. BLOCK:** Right.

**THE COURT:** I ordered the defendant to produce the underlying FBI interview notes that formed the basis for the 302 reports, with appropriate redactions, or show cause why the notes should not be produced. It was straightforward.

**MR. BLOCK:** [Nodded]

**THE COURT:** I'm not trying to give you a hard way to go. I'm just trying to do my job.

**MR. BLOCK:** I understand. And I am as well. I don't have any other sort of -- I suppose, are you seeking an *in camera* production of 302 notes; is that what the Court is asking for?

**THE COURT:** So what you're saying is you have nothing to add to the previous response of the defendant; is that right?

**MR. BLOCK:** That's right.

**THE COURT:** Because it's too complicated or what?

**MR. BLOCK:** No, Your Honor. I think what the defendant is looking for is a clear order of what the Court is looking for.

**THE COURT:** What's unclear about the order that the Court issued? In the Court's view -- I'm not perfect

either. In the Court's view, it's clear and unambiguous what the Court was asking for.

**MR. BLOCK:** I suppose --

**THE COURT:** I mean --

**MR. BLOCK:** What in the Court's view is --

**THE COURT:** If it's ambiguous, then tell me.

**MR. BLOCK:** I guess, what is the evidence that -- evidence is typically -- there's the Rules of Evidence. We get to a civil procedure. We get to trial. And there's the Rules of Evidence. Evidence is tested through witness and credibility and all of that sort of thing.

So, I guess, what is the evidence the Court is seeking that we would be able to provide? What is the process that the Court would like the Department to engage in?

**THE COURT:** Is there another way in which the redactions can be accomplished? In other words, is there another way for the Court to review evidence that shows that the redactions are indeed appropriate?

**MR. BLOCK:** Aside from --

**THE COURT:** Mark, can you turn this thing off? It has a terrible echo, this microphone -- or whatever it is.

Sorry. Go right ahead.

**MR. BLOCK:** No worries.

Again, I think one of the difficulties that I'm

having with articulating this is because of the preliminary inunction posture, and we're talking about what is the evidence? At this stage, the government has given its rationale and its reasoning. And in this court -- generally in this District and the Circuit is afforded the presumption of regularity.

But if there is an order or something that the Court is seeking from the Department, I think we'd ask for just a clear, clean order on what that is so we can then assess that.

Again, I don't know if that's a perfect answer for Your Honor, but that's a bit of the complication that we find ourselves with in this procedural process.

**THE COURT:** This is an unusual hearing. The plaintiff has not seen what's been shared with the Court, but you've seen the Court's order in response to what was shared and you heard government representations this afternoon. Would you like to weigh in on this?

**MS. GILMAN:** Yes, Your Honor.

With respect to the interview notes specifically, defendant has not offered any reason why they cannot produce those documents with victim information redacted. They just don't want to produce those documents.

And I think that that's the issue that they're having here, is that Your Honor has ordered them to do that;

they haven't done it. They haven't done it for more than a month now. They haven't explained why they haven't done it.

And that's true with respect to the binder that defendants also handed you this morning, Your Honor. You asked them to provide that documentation originally by July 30th; they didn't do it. They did bring it to Court today. They haven't explained why they haven't done it.

Your Honor, it seems to the plaintiff that defendant just doesn't want to comply with the order here, and they are trying to figure out a way to continue to avoid complying with the order, so that we can continue to fight about why they haven't complied with the order.

It doesn't seem like there's any reason why they can't just produce the FBI interview notes underlying the specific set of documents that Your Honor has identified, either *in camera* to Your Honor, if you would like to ensure yourself that they are not duplicative.

And it is our position that they are not duplicative because they are not identical information to what has already been introduced, and that you should order defendants to at the very least do that, if not, comply with your original order to produce the notes with victim information redacted.

**THE COURT:** Okay. Thank you.

Any response?

**MR. BLOCK:** Yes, Your Honor.

I would like to make it very clear for the record that any sort of statements about motivations and all of that coming from plaintiff's table are completely baseless. The Department had a herculean effort to comply with the law and produce millions of pages of documents in a very short time frame. This is an unprecedented sort of effort.

**THE COURT:** Are you saying there are millions of pages?

**MR. BLOCK:** Pages, correct, that's what I said, that were produced.

But aside from all of that, Counsel's argument goes straight to a merits argument. We are in a preliminary injunction posture. A PI posture is to reserve and preserve the respective positions of the parties until you get to a merits stage. So we've raised several jurisdictional issues, all of this puts the cart before the horse.

Just to be clear, the relief that they are seeking and the order that they are seeking from this Court would unmask victims; that is in direct violation of the EFTA, the Privacy Act and two protective orders in the Southern District of New York. That's the relief that they're seeking, and they're seeking the final relief on a preliminary posture. That's why the procedure, all of this, has been so difficult to manage.

If the Court's inclined to enter an order, we would ask for a clean, clear order so that we can assess it against the acts and the authorities I've just mentioned, and we would go from there.

**THE COURT:** All right. I'll come back to this.

The third area was with respect to justification for the redactions published on the Federal Register. In the preliminary injunction order, the Court ordered the defendant to either, quote, publish in the Federal Register redaction law required under The Epstein Files Transparency Act, Section 2(c)(2), and update it concurrently with each future release of redacted materials or show cause why it cannot do so.

Now, 2(c)(2), as we know, provides as follows: Quote, all redactions must be accompanied by written justification, published in the Federal Register and submitted to Congress, end quote.

In response, the defendant stated that there is no deadline for submission of the redacted information and that, quote, the notice for publication in the Federal Register, end quote, pursuant to 2(c)(2) of that act will be submitted. That there's no time frame. So that's one question I'm going to ask you about, the time frame.

The defendant provided no information about the time frame and when he expects to do it. The defendant

previously stated that approximately 200,000 pages were redacted or withheld, based on various privileges, and that's in connection with the -- strike that. That's stated in the letter from Todd Blanche, dated January 30th of this year.

These 200,000 pages appear to not include the redactions made pursuant to The Epstein Act. The Court may be wrong about that. That's what the -- it appears to not have those redactions.

The parties dispute whether there was a deadline to publish the written justification in the federal register. I note that The Epstein Act is solid in that respect.

If the deadline was to publish this information at the same time the documents were published in December, it's long overdue, and there is no question in the Court's mind that the parties will also likely dispute what information needs to be included and the written justification.

What do you have to say?

**MR. BLOCK:** Yes, Your Honor.

Again, I appreciate the opportunity to address this.

I understand that the notice is going through the process of -- the several steps that takes to publish something in the Federal Register, that that process is

underway. I can't speak exactly to timing, other than to say it's been represented to me and I'm aware that the process is moving along. Hopefully, this will all be mooted shortly, as to the timing, at least, of the publication.

**THE COURT:** Give me a date. I'm willing to work with you. Give me a date that this can be accomplished.

**MR. BLOCK:** I don't have a date. It's a little bit out of my control in terms of who has to sign and what -- you know, what processes.

**THE COURT:** You knew this was going to be discussed today, though.

**MR. BLOCK:** We did know that it was going to be discussed today, and that is certainly a factor. And, again, I'm told it's going through the process, and so it should be coming. I'm not able to give you a date because, quite honestly, that date is out of my control.

**THE COURT:** You can't give the Court a time frame? Thirty days? Sixty days? Whatever?

**MR. BLOCK:** I'm not able to, Your Honor.

**THE COURT:** Is there someone at the Department of Justice who can do that, recognizing that the Court was going to inquire about this today?

**MR. BLOCK:** Your Honor, I think -- again, there is --

**THE COURT:** If someone else should address that,

pass the microphone to that person. The Court just needs an answer; that's all.

**MR. BLOCK:** Again, Your Honor, it is forthcoming. I don't have anything to say to the Court beyond I know it's in the process.

**THE COURT:** I mean, Christmas is forthcoming. Let's be realistic. No, seriously. I'm willing to work with you. The public demands a time frame. It's not just me. The Epstein Act said do this. The Epstein Act didn't say do it by a certain date.

I guess, an argument could be made that Congress intended that that documentation be provided on the production date back in December. That date has long since passed. The question is: Where do we go from here? That information is still required.

I'm not doing anything other than attempt to enforce what The Epstein Act requires as an act of law. That's all I'm doing. It's not to please me. It's to ensure compliance with The Epstein Act.

I think it's a fair question to say: Okay. You haven't done it. It's been seven months since production was ordered. So what is the government's position with respect to when The Epstein Act can be complied with regarding this particular topic? That's all I'm asking.

**MR. BLOCK:** So the government's position is that,

because the congressional notification, as Your Honor noted, has a 15-day time window associated with it, that letter was published. The Federal Register notice -- this Court is well aware of the process it takes to get something into the Federal Register in any agency.

**THE COURT:** But I assume this issue, this case has been afforded some priority, I hope. Has it not? Compliance with The Epstein Act? That should be front and center.

**MR. BLOCK:** Absolutely. I think compliance with The Epstein Act is evidenced by the hundreds of people who came forward to participate in the review and provide transparency under the Act.

**THE COURT:** You are putting the Court in an awkward position. I don't want to be arbitrary. I will not knowingly be arbitrary. It would be easy for the Court to say: All right. Do it in two weeks. Do it in 30 days. I don't want to do that.

I'm willing to work with the government, but you have to give me a date or a time frame within which the Court can operate. I don't think I'm being unreasonable about that. Otherwise, I'll impose a date, and then we'll go from there.

I'd rather not do that. I'd rather for the government to say: You know, Judge, it's going to take us X

number of days or months or whatever it is to complete this task. It's forthcoming, but we anticipate not before -- give me that date.

**MR. BLOCK:** I understand. I'm not in a position to give you that date, Your Honor. And I understand the Court's point, but I'm not in a position to give you that date.

**THE COURT:** But you knew this was going to be discussed today.

**MR. BLOCK:** We did. And that's why I'm able to tell you that it's in the process and forthcoming.

**THE COURT:** And nobody in the Department of Justice is in the position to give the Court a date for compliance with this portion of The Epstein Act?

**MR. BLOCK:** Your Honor, I'm not in that position.

**THE COURT:** But you're speaking for the Department of Justice.

**MR. BLOCK:** Yes, Your Honor.

**THE COURT:** So I assume there's no one else who can provide that date. Again, I'm not trying to be difficult. I just need an answer.

I mean, if there's someone else who can provide the date, why don't you get that person on the phone. Seriously. If not, then the Court will be forced to impose a date, which is not my preference at all.

All I'm trying to do is to ensure compliance with The Epstein Act because Congress intended that the public and indeed the Epstein victims have information that they've been seeking for a long period of time. That's all I'm trying to do. It's not to please me. My job is to ensure compliance with that law that Congress passed and the President enacted.

**MR. BLOCK:** I understand, Your Honor. If this Court imposes a date, that will be what the Department has --

**THE COURT:** That's not my preference. I'm trying to think of something else the Court can do. I mean, I assume -- not getting into discussions between defendant and his attorneys, but I assume this has been discussed and that's the best answer, that the government can't look at a date and set -- I don't want to make that assumption unless it's true.

**MR. BLOCK:** Your Honor, because of -- I'm not able to represent a date by which it will appear in the Federal Register.

**THE COURT:** All right. Any comment?

It's not my preference. I don't want to be arbitrary about this. I don't know how much time is required. I don't know how many documents we are talking about.

**MS. GILMAN:** Your Honor, I would first like to point out that defendant has represented that all it plans to do is republish in the Federal Register the summary that it already provided to Congress.

First of all, that summary is a high-level summary that points to two categories of redactions. It points to victim information and it points to information that they withheld on the basis of certain privileges and provides a legal basis for withholding those.

It does not point to, for example, redaction of private information that we know the Department has withheld because that was their justification for withholding certain information from the documents that were provided to Your Honor.

That was one thing we did want to bring up today. That with respect to those documents, because they are not withholding victim information, that information should be published in unredacted form.

Plaintiff absolutely wants to ensure that genuine victim information is not disclosed to the public here.

The issue is that we can't rely on the Department's representations about what is or isn't victim information.

We appreciate that Your Honor is asking the Department to provide documentation supporting its

assertions about what is and isn't victim information.

But with respect to the documents the defendant has made clear do not contain victim information, those documents should be produced.

Again, that entire category of redaction is not in the summary provided to Congress. Regardless, under The Epstein Act, there is a separate obligation that they provide an explanation for all redactions, accompanied by a written justification published in the Federal Register.

So to the extent that Your Honor is going to ask the Department to explain exactly what they are doing, we would submit that you should also have them explain what exactly they are proposing is submitted to the Federal Register and when that's going to happen.

We can't rely on the representations of counsel here in court today with not providing any declaration, not providing any explanation of who in the Department said this was being prepared for the Federal Register, what is being prepared for the Federal Register. It's just not adequate.

Again, this appears like another attempt to just delay implementation of Your Honor's order.

**THE COURT:** Are you proposing that the Court issue another order? Is that what you are proposing? I can't get an answer of a date. What do you propose?

**MS. GILMAN:** Your Honor, we would submit that it

is clear defendant has not complied with the Court's original order. We originally submitted that sanctions were because of that non-compliance. We are now, I think, two orders past that original order. We still submit that sanctions would be in order because of defendant's non-compliance.

If the Court wants to take an interim step, we think the Court should order a declaration that fully explains what steps are being taken, what information is going to be submitted, when it is going to be submitted.

But as Your Honor said, it is not fair to the public that the defendant continues to simply flout its responsibilities under the Act.

**THE COURT:** Thank you.

Counsel, is that unreasonable to ask for a declaration?

**MR. BLOCK:** Your Honor, I don't know what declaration the plaintiffs are seeking. I think the defendants have continued to try in their best efforts to comply with this Court's orders. The idea that any of the Court's orders have been disobeyed is flatly wrong. All of the orders have said to do this or show cause.

We have submitted timely briefs and completed all of those actions by the deadlines set by the Court. So I think any suggestion that there's fines or contempt or

anything is appropriate are just, kind of, off the table.

That said, I think that the things here that have been highlighted are representative of the fact of what I was talking about earlier, being on the preliminary injunction posture. There are certainly jurisdictional issues. But if your Court is inclined to seek some sort of action, what we would ask for, what I would ask for is a clear, clean order that directs the Department to do something by a particular --

**THE COURT:** I've done that. You want me to issue another order and say, "I really mean it this time"? If you think it's ambiguous, tell me. If it's not clear, tell me why it's not clear.

**MR. BLOCK:** It's not that they haven't been clear, Your Honor. It's that there's been "or show cause" attached to those orders. So what we have attempted to do is show the cause on why --

**THE COURT:** Right. I did that in fairness to the parties. The parties were directed to do certain things or show cause why they can't be done. That's done in an effort to be fair to the parties. There may be reasons why a party cannot comply with an order. And I understand that. I've done that.

So are you telling me that the answers that have been provided are the best answers that the defendant can

provide?

**MR. BLOCK:** Yes, Your Honor.

**THE COURT:** There's nothing else the defendant can say with respect to this current order?

**MR. BLOCK:** There's not anything else I can say in open court. Going back to, I think, the first topic, there are potentially things I could say to Your Honor if we were allowed to approach in ex parte, but there's just things I can't say in open court.

**THE COURT:** You know what? You raised an interesting point. There was a time when I thought about having just a civil proceeding because neither the plaintiffs nor the public knows what's been produced. And I thought about, maybe, it's appropriate to bring the government in and just talk to the government one on one with the government in a sealed proceeding.

Then I said, wait a minute, the public has a right to know what the hell is going on in this case. The victims have a right to know. The Court has a right to know. So I decided it would be a public hearing, which has its constraints as well, because the plaintiffs don't know what's in the order. They don't know what's in the production.

Are you suggesting that the Court will be in a better position to understand all of this if the setting was

indeed a private setting between the Court and the government; is that what you're suggesting?

**MR. BLOCK:** No, I don't think so, Your Honor. I think that the documents --

**THE COURT:** In other words, I wouldn't learn any more if I had a private setting?

**MR. BLOCK:** I think the documents that we've submitted today will speak for themselves.

**THE COURT:** Okay.

You know, let me throw this out also. The written justification could be something as simple as: The Court is informed that the written justification is as follows...

But if you're telling me there is nothing else that can be said, can the Court assume that that's it? That's all the information that the Court is going to get, which you've already provided?

**MR. BLOCK:** Could you restate that? I'm sorry. I'm not sure I follow. Are you talking about one particular category?

**THE COURT:** Any category. I mean, I was just using that as a for-example, "That the written justification" --

**MR. BLOCK:** I see.

**THE COURT:** The government could say, "The written justification is the following," and just tell me with a

written justification. Can you do that?

**MR. BLOCK:** I think the written justification we've provided --

**THE COURT:** You've already provided?

**MR. BLOCK:** Yes.

**THE COURT:** There's nothing else to add to that?

**MR. BLOCK:** I don't think so, Your Honor.

**THE COURT:** There's some other pending issues. I want to talk about the other pending issues, but I'm going to take a short recess. One of the other pending issues has to do with the foreign language documents and the preliminary injunction order.

And let's be mindful, that was a Court order. The Court ordered the defendant to, quote, initiate review and production, review and produce foreign language materials that may be subject to production under the Epstein Files Transparency Act, and provide notice to the Court and all parties that such review is underway.

The defendant responded that the Court: Should not supplant Congress' acceptance of its explanation," that it did not review any foreign language documents. Because, quote, it was not practicable for a first-level reviewer to determine the responsiveness of a foreign language document, end quote.

The defendant provided no legal support for its

position. Stating only that, quote, the government continues to believe that the Court lacks the authority to supplant Congress' acceptance of this explanation.

First, let me just say, I'm not trying to supplant anything. All I'm trying to do is to ensure compliance with The Epstein Act. That's what Congress intended also. Pass a law that it expected to be complied with. One of the requirements was for the treatment of foreign language documents.

Just because you never received a response to your declaration to Congress certainly doesn't mean that the law was amended. The law is still in full force and effect. Again, all the Court is trying to do is ensure compliance.

So the question today is: When will that process be commenced and completed, the foreign language document process? And how many documents are we talking about?

**MR. BLOCK:** Well, Your Honor, I'm not sure I have the number of foreign language documents.

**THE COURT:** But you knew this was going to be discussed today. Again, I'm not trying to give you a hard way to go, Counselor. You're at the podium, though. You're speaking on behalf of the Attorney General. These are not just questions the Court thought of. They are questions that were raised in the Court's order scheduling this hearing that we're going to discuss these issues today.

All the Court is asking is: How does the government intend to comply with the foreign language document component of The Epstein Act? That's all.

**MR. BLOCK:** With respect to the foreign language component, our briefing is still the position -- and I don't know that that has changed. The foreign language, I would just say --

**THE COURT:** Is it the government's position that the government is not going to comply with that section? I mean, I just need to know. If you're going to comply with it, let's talk about a time frame.

Again, I'm willing to work with you. I just need something from the government to suggest that: We are going to do this and we're going to complete this task by a reasonable time frame.

**MR. BLOCK:** So, Your Honor --

**THE COURT:** Look, I'm not just dreaming this stuff up. This is in The Epstein Act. All I'm trying to do is ensure compliance.

**MR. BLOCK:** I understand. Again, I think it goes back to our jurisdictional briefing at the preliminary injunction stage, as well as the supplemental briefings --

**THE COURT:** So is it the government's position that the Court lacks the authority at the preliminary injunction stage to request this information or to demand

this information? Is that your position?

**MR. BLOCK:** The government's position is that the plaintiffs lack standing to bring the case. I understand that that has been briefed and decided in Your Honor's memorandum and opinion. However, that order is not a final order because of all of the "show-cause" contingencies in it.

Certainly, where there is a final order that demands either compliance or appeal, the government will respond accordingly.

But the current position, as articulated in our briefing, is that it's impractical for people, the reviewers, to determine -- the threshold issue of responsiveness is not something that the first-line reviewers have the ability to do.

**THE COURT:** All right. So not to put words in the government's mouth, but the Court has learned everything it's going to learn about the government's position vis à vis foreign language documents. There's nothing else to add, other than what you stated, on behalf of the government?

**MR. BLOCK:** No, Your Honor. Yeah, that's right.

**THE COURT:** Is that right?

**MR. BLOCK:** That's right.

**THE COURT:** With respect to the category that

addresses redactions and withholdings based on the Privacy Act, I'm not going to get into any discussion of the Privacy Act today.

The email addressed redactions that are consistent with a review protocol. I can tell the parties that I accept the explanation at this time, with the caveat that whether the invocation of the Privacy Act for making certain redactions is consistent with The Epstein Act can be determined at a later date.

The appealability of the preliminary injunction order, the defendant questions whether the Court's preliminary injunction order is appealable because of the order to show cause aspect of it.

I can resolve that issue when the Court rules on defendant's responses to the preliminary injunction order and *in camera* order and when the Court rules on the motion for stay of deadlines. So I understand your concern, and the Court's going to address that.

There are certain other pending matters that I'm not going to -- I'm going to allude to them, and I have more to say, but I'm going to take about a 15-minute recess. And I'll address the pending motions, and then I want to talk about an issue, but I will do that in more detail when the Court returns after the recess. The Court will take a 15-minute recess. There's no need to stand. Thank you.

(Recess from 2:00 p.m. to 2:39 p.m.)

**DEPUTY CLERK:** Your Honor, resuming civil action 26-1417, Katie Phang versus Todd Blanche.

**THE COURT:** Let me thank the United States government for its submission. No, seriously. I just had a chance to do a very cursory review and will do a more detailed review. But thank you. I really appreciate that.

With respect to matters that we've discussed, the Court is going to request proposed orders from the plaintiff.

Regarding the FBI interview notes and the written justification for the redactions to be published in the Federal Register, the Court has requested the plaintiff to provide a proposed order.

The proposed order should address the Court conducting an in-camera review of the FBI interview notes. The proposed order should also address plaintiff's proposed, quote, interim step, end quote, that the defendant provide the declaration regarding the defendant's compliance with this requirement.

Is 10 days sufficient, enough time, or do you need more time?

**MS. GILMAN:** That is great.

**THE COURT:** Thank you.

The pending motions, I am not going to talk about

them. Because they are pending, I am going to resolve them in due course. But I am aware of the three or four pending motions.

Let me talk about a subject for a few minutes, just a conversation to make sure that we're all on the same page.

The plaintiff has raised the issue of contempt. Relax. No one is in contempt. All right? The plaintiff has raised the issue of contempt in response to the Court's preliminary injunction order. I just needed to -- let me say this: I think now is a good opportunity to discuss that topic in very general terms with the parties. I'm not focusing on the plaintiff or the defendant, just the parties. To make sure that we're all on the same page.

I am going to talk about a case that this Court presided over in 2000 -- I think it was 2008. There was a trial of Senator Ted Stevens. It was a high profile case.

It was a very unusual case, not because the subject matter was complicated. I think Senator Stevens was indicted because of his alleged failure to comply with reporting certain assets on government compliance reports. It started off to be what I thought would be a somewhat traditional prosecution of a case. I was completely wrong. It wasn't traditional by any stretch of the imagination.

The first thing that occurred was Brendan

Sullivan, no relation, represented Senator Stevens. Said to the Court, Judge, we are not relying on and we are not revoking the Speedy Trial Act. We are not filing any motions that would have the affect of tolling a speedy trial.

Senator Stevens was up for re-election. I think at the time, Senator Stevens was the longest-serving senator at that time. He was planning to run for re-election. That was the first time -- I came on this court in '94. I've been a judge for over 41 years. That was the fist time -- and I think since then, that's been the only time -- that an attorney in a criminal matter has told this Court that it was not going to file any motions, that it was not relying upon the Speedy Trial Act, other than to enforce it and demand a trial within a prescribed time limit.

And it caught me off guard because that had never happened before. And it hasn't happened since either, I can tell you that.

I said: Absolutely, we'll do that.

You're not going to filing any motions?

None. He said: We have a pretty good idea what the government's case is. We plan not to file any motions because if you file motions, that would toll the speedy trial clock, and that's something the defendant did not want done.

I said: Fine, you'll get a speedy trial and you'll get a fair trial.

The case was complicated because on more than one occasion, it was brought to the Court's attention that exculpatory evidence for the senator had not been provided to the senator. This happened on I don't know how many occasions, but there were many.

The Court ordered production of documents. The Court instructed the jury that the government had failed to do certain things and instructed the jury to disregard certain things because it was appropriate for the Court to do that because of the delay in providing that exculpatory information to the senator.

I don't know how many times it happened, but if it happens once, that's one too many. But there were more than a few occasions where that happened, where the Court had to admonish the government to take -- and instruct the jury to consider certain things or disregard certain things because it was appropriate.

The senator was found guilty. He was not re-elected. And then the period started for post-trial litigation. Should there be a new trial. That had its own problems as well.

Something happened that's never happened in my career. A whistleblower appeared. The whistleblower was an

FBI agent who had been sitting at the table of government counsel for pretrial proceedings and during the trial. He was always there. I'm not going to mention any names about anyone.

He was blowing the whistle loud and clear on the government and the efforts made by individuals to conceal certain information favorable to the defendant that the government had an obligation to produce, and it was alarming what was discovered.

There were about 33 or 34 documents that were the focus of discussions in post-trial litigation. Everyone agreed that the defendant should have access to those documents. I issued an order directing the government to turn those documents over and thought no more about it.

Then we had an interim status hearing to check on things and bring the parties in to talk about the case. And I said something like: I assume that Mr. Sullivan's defense counsel received the documents that the Court ordered whenever I ordered them, in January sometime. The status hearing was in February. February 13th, actually.

Defense counsel, who had previously filed the motion to hold the government attorneys in contempt, responded: No, we haven't received anything, Your Honor. I had seen the motion, but I didn't pay much attention to it. It said they hadn't received the documents. I thought to

myself, well, they'll get them.

Two or three weeks went by after the motion was filed and we had a status hearing. And I inquired: You received the documents, haven't you?

Nope. We haven't received them.

I told the attorneys: You give me no choice. I am holding each one of you in contempt of court. Was I happy to do that? Absolutely not. Was I proud of that? No. But I had to do it because that was consistent with the fair administration of justice.

I knew these prosecutors. They'd been in a trial and I had known them from other cases. I didn't want to do that, but I did. I had to. I had no choice. How else was I going to ensure that justice was administered fairly? So I held them in contempt.

The documents were turned over later that day. I purged -- the contempt was purged. I let the record reflect that the contempt's been purged. There was an appeal by three of the four prosecutors. I didn't know it. We don't pay much attention to when notices of appeal are filed. The post-trial proceedings are going to continue anyway.

I didn't know about it and didn't think about it. No one said: By the way, we appealed your order. That's fine. If people aren't satisfied with the judge's order, then you ought to appeal it, if there are legitimate bases

to do so.

The issue went up to the Court of Appeals. And then one day, out of the clear blue, we received a copy of an opinion affirming the Court's civil contempt order and dismissing the appeal. I think an argument on appeal was: The Judge held us in criminal contempt and deprived us of protections afforded by people charged with criminal contempt.

The Court of Appeals took the position: No, that's not correct. What the Judge did was to order compliance with his order and the nature of civil contempt, which is an appropriate remedy to ensure compliance of judicial orders. And the appeal was dismissed.

I just mention that because that topic of contempt has been alluded to in a pleading. The Court's not proceeding with that. The Court doesn't have any intent in proceeding with contempt matters. I don't want to get sidetracked with contempt matters.

That's why I'm sharing this story. I am probably the only judge in this Circuit -- in fact, I can probably say that I am the only judge in this Circuit, who has ever held Department of Justice attorneys in civil contempt. And that issue has been affirmed by the U.S. Court of Appeals for this District.

The cases have not -- the pleadings that have

addressed contempt haven't referred to the Stevens matters. But there's two opinions, and I will give you the citations. I think both sides should be aware of the citations for the opinion I wrote in re: Contempt finding, United States versus Stevens, 744 F.Supp. 2d 253, and in re: Contempt finding in United States versus Stevens, 663 F. 3d 1270, and it's a 2011 opinion confirming what I did.

The reason -- I'm mentioning this for a couple reasons. First of all, the subject has been brought up in a pleading. Secondly, I think it is important to know what a trial judge has done. I think it's important for the parties appearing before a judge to know how far he has gone to enforce legitimate judicial orders.

That's the only reason I'm bringing it up, to make sure that we're all on the same page. I could have not said anything about this and at some point maybe, maybe hold a party, plaintiff or defendant, in contempt for not complying with the Court's order.

But, you know, I'm not in the habit of blindsiding people. So I throughout I'd bring it up, just so everyone knows what this Court has done in the past, and to emphasize that the Court has absolutely no desire to go down that road again. None whatsoever. I've never held anyone in contempt other than that case and hope to never hold anyone else in contempt.

I mean, contempt is serious. For 21 years, I was on the Judicial Nomination Commission of D.C., either as a member or, for the most part, as its chair. That's an apolitical group that sends names of outstanding lawyers to the President, whoever is in control of the White House, for consideration and appointment to the Superior Court and D.C. Court of Appeals.

As you can well imagine, part of the colloquy that goes on has to do with: Has your conduct ever been questioned by a judge or someone else? Because that's an appropriate area to inquire about, especially if a board is considering sending someone's name to the White House.

So that's a very serious matter for the Court to hold attorneys in contempt. It's something that they probably have to report for the rest of their career, if they are seeking a new job, if they're being considered for a judgeship, locally, federally or maybe in a confirmation hearing where some inquiring Senator will say: Talk to us about the contempt matter some years ago before judge whoever.

So none of us judges are very anxious to impose contempt because we recognize that there are far-reaching ramifications of that action. But by the same token, we also recognize that we have a job to do, and that is to fairly administer justice. And that's what we will have to

do in order to accomplish that objective.

Again, I'm not insinuating I'm going to do something. I'm not anxious to do anything. I'm just putting everyone on the same page that I've done it before and been affirmed.

I don't look forward to doing it again, by any stretch of the imagination. But I think it's fair to put the parties on notice that this is something that's been done by this Court. I think I'm probably the only judge in this Circuit who's ever done that. I think Judge Lamberth did something some years ago with another branch of government. But our research shows that there aren't other cases -- well, actually, there is a case in Minnesota.

The record is sealed, but the docket reflects the judge held the DOJ attorney in contempt and imposed a monetary fine. I don't know anything about that case. It's sealed. I've not reached out to that judge and have no intention to reach out to that judge.

But I thought it's only fair and appropriate and consistent with my obligations to the Bar to provide them with notice of information that they should deem appropriate and consider that information when they go forward in a lawsuit.

So that's the only reason why I'm saying that. I'm not interested in doing that at all. But I will do it

to ensure that justice is administered fairly. And that's not a threat; that's a promise.

That's all I have to say. I'm not asking anyone to respond. No one is in trouble. I'm just bringing it to your attention. I don't want to go down that road. Been down that road; don't want to ever do it again.

But I think it's fair since the subject has been alluded to in a pleading. I'm not focused on that issue right now. I'm focused on compliance with court orders.

While we're talking about compliance, let me just suggest a couple things. If a party has nothing to respond to a Court's order requiring that a party do something or say something, and the party does nothing and says nothing, that's not the correct approach.

The correct approach should be -- suppose the Court orders a reply to a pleading and a party thinks that it has nothing to offer in terms of complying. As opposed to ignoring that order, maybe the better part of wisdom is to say: Respectfully, we rest on the pleadings previously filed. We have nothing to add and we are not going to repeat our arguments or something like that, as opposed to not saying anything at all.

Because how should a Court interpret that when there is a directive to do certain things, but it appears that that directive has not been complied with? You don't

want a judge to reach the wrong conclusion, whatever that is, and take action, which the Court could do without a hearing. There's no requirement that the Court have a hearing to sanction someone for contempt. None whatsoever.

I mean, I would never do that. I'm not saying I would never do that. I would prefer not to do that. But then, I would prefer not to enter into contempt proceedings either.

Again, I'm just having a conversation. If someone wants to respond, you can. But I am just doing it because I recognize and understand how difficult your job is. I've been there. Practiced law for more than 10 years. I understand how difficult and complex it is, and everyone is fighting deadlines that are imposed by different judges. No one ever has enough time.

I'm constantly saying no one ever has enough time to do what he or she wants to do. And that includes judges.

Sometimes if you run out of time and you don't have the time to respond, sometimes the better part of wisdom is to ask for more time.

I don't think in 41 years I've ever denied an attorney's request for additional time. I don't think I've ever done that. In fact, I'm the one, more often in court, asking an attorney: Do you need some more time? You've suggested a certain date. I'll give you more time.

Because I want your best effort in responding to an issue that's been raised.

Again, I'm just having a conversation. It may be a one-way conversation. That's fine. I'm not asking for a response. I just thought I'd bring it up because I think it's important. All right? Okay.

Again, no one is in trouble. The subject has come up. I'm not taking any action. I hope I never will have to take any action in this case or any other case, for that matter. Because those findings follow attorneys. After 21 years on that commission, I know the impact of such a finding on a lawyer aspiring to be a judge. I know what it is.

So that's all I have to say about that. If you want to say something, fine. But you are under no obligation to say something. No one is in trouble, but I would be remiss if I didn't bring it up and kept it to myself, and then hold someone in contempt and the parties say: Dammit. We didn't get any notice that he might do this.

All I'm doing is providing fair notice. All right? I hope to never go down that road again. Believe me. I've run out of words to say. If you want to respond, you can. But, again, no one is in trouble. I want the record to be clear about that. I am just being upfront and

personal because I think it's the thing to do.

Again, it's not threatening. It's a promise. I have a job to do to administer justice, and I take that very seriously, and have for the past 41 and a half years.

Anyone want to talk about anything else? The Commanders? Something else?

Why don't you come to the microphone. It helps the court reporter tremendously. The acoustics are bad in this courtroom.

Yes. Go ahead.

**MS. GILMAN:** Your Honor, we understood from your comments earlier that you want to resolve the issue of the defendant not having answered the Complaint at a later date. If that's correct, then we have nothing further. But if Your Honor is willing to take that up, we would maintain that defendant is now more than 30 days past his answer date and should be also ordered to answer the Complaint.

**THE COURT:** Well, I think the defendant is well aware of that. I have nothing else to add today.

**MS. GILMAN:** Thank you, Your Honor.

**THE COURT:** But thank you for bringing it up.

Thank you. The parties are excused.

(Proceedings concluded at 3:02 p.m.)

C E R T I F I C A T E

I, Lorraine T. Herman, Official Court Reporter, certify that the foregoing is a true and correct transcript of the record of proceedings in the above-entitled matter.

| | |
|---|---|
| August 13, 2026 | /s/ Lorraine Herman |
| **DATE** | **REPORTED BY** |